1
2
3
4                        UNITED STATES DISTRICT COURT
5                      NORTHERN DISTRICT OF CALIFORNIA
6
7    LUCRETIA V JOHNSON,                    Case No.  13-cv-05163-JSC
              Plaintiff,
8                                          **ORDER DENYING PLAINTIFF'S**
         v.                                **MOTION FOR SUMMARY JUDGMENT**
9                                          **AND GRANTING DEFENDANT'S**
     CAROLYN W. COLVIN,                     **CROSS-MOTION FOR SUMMARY**
10                                          **JUDGMENT**
              Defendant.
11                                         Re: Dkt. Nos. 11 & 12
12

13        Plaintiff Lucretia Johnson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),

14   seeking judicial review of the determination of Defendant Carolyn W. Colvin, Commissioner of

15   the Social Security Administration ("Defendant"), that Plaintiff, though disabled for over a year

16   and a half, was no longer disabled after April 25, 2011.  Now pending before the Court is

17   Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment.

18   (Dkt. Nos. 11 & 12.)  Having carefully considered the parties' submissions, the Court hereby

19   DENIES Plaintiff's motion and GRANTS Defendant's cross-motion.

20                              **LEGAL STANDARD**

21        An ALJ conducts a five-step sequential inquiry to determine whether a claimant is entitled

22   to benefits.  20 C.F.R. § 416.920.  At the first step, the ALJ considers whether the claimant is

23   currently engaged in substantial gainful activity (*i.e.,* if the plaintiff is currently working); if the

24   claimant is not, the second step asks if the claimant has a severe impairment or combination of

25   impairments (*i.e.,* an impairment that has a significant effect on the claimant's ability to function);

26   if the claimant has a severe impairment, the third step asks if the claimant has a condition which

27   meets or equals the conditions outlined in the Listings of Impairments in Appendix 1 of the

28   Regulations (the "Listings"); if the claimant does not have such a condition, the fourth step

assesses the claimant's [residual functioning capacity ("RFC")] and determines whether the claimant is still capable of performing past relevant work. *Id.* §§ 404.1520(b)–404.1520(f). An ALJ will often consult the Dictionary of Occupational Titles ("DOT") for "supplementary and corroborative information" on the physical and mental demands of a claimant's former work. Social Security Ruling ("SSR") 82–62, 1982 WL 31386, at *3. If the claimant is not capable of performing his past relevant work, the fifth and final step asks whether the claimant can perform any other existing work in the national economy based on his residual functioning capacity ("RFC"), age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920; *Stout v. Commissioner,* 454 F.3d 1050, 1052 (9th Cir.2006). The burden then shifts to the defendant to demonstrate the existence of a significant number of jobs in the national economy that could be performed by the claimant. *Tackett,* 180 F.3d at 1098. This burden is satisfied through testimony from a [vocational expert ("VE")] or reference to grids that present "a short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Id.* at 1101.

## THE ADMINISTRATIVE RECORD

### A. Procedural Background

Plaintiff filed an application for Social Security disability insurance benefits on June 25, 2010, when Plaintiff was 49 years old. (*See* Administrative Record ("AR") 61.) Plaintiff's application was denied in November 2010 by the Social Security Administration ("SSA"), which found that Plaintiff's "condition [was] not severe enough to keep [her] from working." (AR 68.) In December 2010, Plaintiff submitted a Request for Reconsideration, and in August 2011, the SSA affirmed the original decision denying Plaintiff's claim. (AR 73-74.) Shortly thereafter, Plaintiff submitted a Request for Hearing By Administrative Law Judge, and a hearing was held on July 16, 2012. (AR 80, 128.) Plaintiff, Plaintiff's attorney, and VE John Kilcher appeared at the hearing. Plaintiff and the VE testified at the hearing.

Following the hearing, the ALJ issued an opinion finding Plaintiff disabled due to depression from July 31, 2009 through only April 25, 2011. (AR 25.) Plaintiff sought review from the agency's Appeals Council, but was denied an appeal in September 2013. (AR 1, 20.) Plaintiff now seeks review from the Court.

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.  Relevant Factual Background**

Plaintiff worked at Sam's Club for 15 years.  (AR 44.)  As an employee of Sam's Club, Plaintiff oversaw the marketing department, a role that included "going out, giving presentations to large corporation[s]," "overseeing cashiers and a staff of about 15 and the membership desk," "[selling] memberships and [participating] in giving out grants for the community," and "training and developing" associates in both Plaintiff's location and in other Sam's Club locations.  (AR 44.)  Plaintiff was also involved with creating schedules for employees, "personnel hiring and firing," and lifting and carrying up to 50 pounds.  (AR 44-45.)  Plaintiff testified that she left her position at Sam's Club due to "continued years of harassment," including sexual harassment.  (AR 45.)

Plaintiff has been attending school at Los Medanos College since 2010, taking one course that combines "basic English and math."  (AR 45-46.)  Since 2010, she has been taking "the extension" of the course, instead of simply repeating it.  (AR 47.)  Plaintiff attends school part-time, "taking eight to eleven" units, and is normally in class Monday through Thursday from 9:00 a.m. to 11:00 or 11:45 a.m.  (AR 45-46.)  As of April 2011, Plaintiff was also taking physical education classes "for cardio exercises."  (AR 552.)  Plaintiff has someone to help her with note-taking in class and a tutor who helps her with homework for two to three hours after class.  (AR 45-46, 49.)  Homework is "overwhelming" for Plaintiff because she has "a hard time comprehending and remembering what [she] just did."  (AR 46, 50.)  At the time of Plaintiff's testimony, she had a B in English and an A in math with an overall GPA of 2.0.  (AR 46-47.)  Plaintiff uses a computer for "math lab and typing for . . . English," and Plaintiff is usually able to complete this homework on the computer in about an hour or two.  (AR 51.)  After tutoring, Plaintiff will usually "go back home, lay down, [and] go to sleep."  (AR 50.)  Plaintiff's academic goal is to "teach kids, child development."  She admits that she still has to fulfill prerequisite courses before taking child development courses, and that even then it takes about "four years between child development and becoming a teacher."  (AR 47-48, 53.)

Plaintiff has her own bedroom in an apartment she shares with two other people, makes frozen dinners for herself, and does her own laundry.  (AR 50-51.)  Plaintiff used to "walk a lot"

and "be active in church" but now she engages in both activities less frequently.  (AR 52.)

Plaintiff drives to her weekly doctor's appointments, to church, and to school.  (AR 44, 53.)

Plaintiff does not believe she is capable of working because of "problem[s] focusing and concentrating," "fear of dealing with supervisors and managers," and lack of confidence.  (AR 48.)

Plaintiff stated that she was taking Cymbalta, Abilify, and Prevad at the time of her testimony, and that she was experiencing no side effects from the medication.  (AR 48.)  She began seeing Dr. Rebecca Thompson in 2010, and continued seeing her every week for counseling.  (AR 54.)

Plaintiff's sessions with Dr. Thompson "have been a help" to her, even though it is "[a] slow process."  (AR 54.)  Plaintiff had at one point contemplated suicide, but no longer did since seeing Dr. Thompson.  (AR 54.)  Plaintiff does not think she is capable of going back to work in the future because her "confidence is torn and [she] feel[s] hopeless."  (AR 55.)  Plaintiff did, however, admit that if she gets treatment, she might be able to go back to work.  (AR 55.)

**C.   The Medical Evidence**

Sometime after Plaintiff left Sam's Club on July 31, 2009, she filed a workers' compensation claim.  (AR 409-10, 551.)  Plaintiff's insurance carrier did not accept her psychiatric claim, but Plaintiff was placed on short-term disability leave from 2009 to 2010, and then long-term disability leave beginning in January 2011.  (AR 551-52.)  Plaintiff was instructed to see Dr. Ronald Leon for a psychiatric consultation and Dr. Maria Barnhart for weekly, individual psychotherapy sessions in relation to her workers' compensation claim.  (AR 318.)

Plaintiff has continued to see Dr. Leon "for medication and counseling, generally on a monthly basis."  (AR 411.)  She also "started seeing a new psychologist, Dr. Rebecca Thompson, . . . on an industrial basis" and continued to see Dr. Thompson on a weekly basis. (AR 411, 550, 589.)

In an occupational health report dated August 5, 2009, Plaintiff described the harassment sustained at Sam's Club as follows:

> She states that recently she has been written up for poor training skills, poor communication skills, and poor performance of her department.  She states that she was counseled recently for poor production in the membership department.  The patient states that occasionally when some of her subordinates call in sick or are off work on short notice, she is asked to work in their positions and she feels that this is unfair treatment of a manager.

United States District Court
Northern District of California

(AR 306.)  The report concluded that plaintiff had "[d]epression with mixed anxiety" that was "non-work-related."  (AR 306.)

Plaintiff voluntarily admitted herself to the John Muir Behavioral Health Center inpatient program on August 14, 2009, "due to severe depression and suicidal thoughts."  (AR 343.)  When Plaintiff was discharged three days later, she was diagnosed with "Major Depression recurrent" and was prescribed Cymbalta, Ambien, and Xanax.  (AR 343.)  The Discharge Summary states that "[i]n the hospital she improved.  She felt more positive, more upbeat.  She was denying suicidal ideation, however she had a lot of anxiety.  She became more hopeful . . . ."  (AR 343.)  Plaintiff was advised to continue seeing Drs. Leon and Barnhart.  (AR 350.)

Plaintiff was referred to the Partial Hospital Program for a psychiatric evaluation following her discharge from John Muir.  (AR 351.)  The August 2009 evaluation stated that Plaintiff reported having had a happy childhood and that Plaintiff enjoyed a good relationship with her family and friends, from whom she received a lot of support.  (AR 352.)  Plaintiff reported having completed high school and some college courses, and had held a number of jobs including working for the Air Force Exchange.  (AR 352.)  Plaintiff was diagnosed with "Major Depression, single episode," though the report also noted that her "[t]hought process is goal-directed," "[j]udgment is fair," and "short-term and long-term memory are intact."  (AR 352.)

### 1.  Dr. Portia Polner

Dr. Portia Polner, a psychologist and one of Plaintiff's examining physicians, first examined Plaintiff in October 2009 and performed re-evaluations in August 2010 and April 2011 as part of Plaintiff's workers compensation claim.  (AR 546, 558.)  In the August 2010 re-evaluation, Dr. Polner concluded that Plaintiff's "current psychiatric complaints as of August 12, 2010 appear fairly consistent with those she was experiencing in 2009 with some modest improvement in her bouts of depression and insomnia."  (AR 410.)  Plaintiff "continues to adhere to the perception that her work primarily caused her psychiatric condition.  She blamed herself for staying so long under those stressful conditions at Sam's Club.  She currently is experiencing difficulty in letting go of the past, grieving the loss of her 15-year career there and not yet being able to crystallize an image of her vocational future."  (AR 415.)  Dr. Polner also provided the

United States District Court
Northern District of California

following work update:

> [Plaintiff] had sought out a less stressful job, but feels that she cannot work at this time due to her residual trust, rejection issues from her Sam's Club experience. Currently she is exploring other career options with her psychologist, and considering teaching as a career, or a home health aide position an obtaining re-training. She is considering re-training in a two-year program in business, but not retail. At this time she expressed difficulty in making decisions regarding future career goals.

(AR 412.) Dr. Polner also described Plaintiff's daily activities as including eating breakfast, "walking two miles for exercise," exploring "vocational and college sites on the web," preparing "a healthy lunch," paying bills, running errands, cleaning her room, attending church, and visiting with friends. Plaintiff also "expressed that she feels that she is in 'limbo, whether [her] job will still be there.'" (AR 414.) Dr. Polner concluded that "the 2009 personnel actions against [Plaintiff] represented a factor, but not a predominant factor in the onset of [Plaintiff's] anxiety and depression." (AR 419.) Dr. Polner opined that

> [Plaintiff] has not yet become Permanent and Stationary for rating purposes . . . . Once she is Permanent and Stationary, [Plaintiff] should be afforded vocational rehabilitation training vouchers to upgrade her skills to secure a different line of work. She readily admits that at this time she is not emotionally equipped to return to her former employer. Perhaps in the future once she becomes stable, she may wish to reconsider returning to Sam's Club if appropriate work is available for her.

(AR 419.)

In a second follow-up evaluation dated April 25, 2011, Dr. Polner reached a different conclusion. Dr. Polner found that "[t]he records indicate that [Plaintiff] was apparently approaching psychological closure on her Sam's Club experience and started exploring new career options such as early childhood education." (AR 550.) Dr. Polner described Plaintiff's "Current Self-description" as such:

> In this re-evaluation [Plaintiff] displayed more optimism regarding her future than before. In her April 25, 2011 interview she characterized herself as "a person who has been really damaged, abused, misused, but working towards rebuilding her self-confidence." This time she remarked that her "core self has hope that she will find herself again, and not permit abuse to occur again in her life in the future." She envisioned a more optimistic future stating that "eventually she feels that she will be happy again in her

life."

(AR 554-55.)

Dr. Polner opined that her psychological evaluation of Plaintiff "indicates an individual who is experiencing significant emotional distress in [her] life marked by depression, anxiety, worry and somatic symptoms.  However, none of the testing suggests that her clinical symptoms are grossly incapacitating."  (AR 555.)  Dr. Polner concluded that

> [b]ased on Dr. Thompson's medical records and my direct examination of [Plaintiff] on April 25, 2011, in my clinical opinion [Plaintiff] is now Permanent and Stationary for rating purposes. Although [Plaintiff's] clinical symptoms have showed modest improvement, she has clearly demonstrated an increase in her functioning by starting to take college courses, undergoing vocational assessments to pursue a new career, and expressing a definite shift from hopelessness to hopefulness . . . . As for her Temporary and Total Disability, the onset occurred at her original Date of Injury until the date of this re-evaluation on April 25, 2011.

(AR 556.)  Dr. Polner attributed Plaintiff's "psychiatric work trauma" to "incidents of harassment, possible discrimination delaying career advancement, and lack of management support" while Plaintiff was a Sam's Club employee.  According to Dr. Polner, "[s]uch environmental deficits within Sam's Club organizational and managerial culture . . . far outweighed [Plaintiff's] diminishing level of work performance under those working conditions."  (AR 558.)

### 2. Dr. Ronald Leon

Dr. Ronald Leon is a psychiatrist whom Plaintiff has been seeing "once a month for medication" since September 2008.  (AR 404, 550).  In a report from September 2010, Dr. Leon found Plaintiff to have "Major Depressive Disorder, single episode," and found her to be oriented, with intact concentration, normal memory, and above average intelligence.  (AR 404).

In an April 2012 evaluation, Dr. Leon opined that Plaintiff suffered from "major depression anxiety . . . .  She is making very slow progress and has periods of exacerbation which make her ability to return to work of any nature very doubtful at this time and in the foreseeable future."  (AR 588.)

### 3. Dr. Rebecca Thompson

Plaintiff began seeing treating physician Dr. Rebecca Thompson, a psychologist, in May

1  2010, and continued to see her on a weekly basis.  (AR 550.)  In a report dated December 2010,

2  Dr. Thompson found Plaintiff to have a "substantial loss" in her ability to "understand, remember,

3  and carry out simple instructions," "make judgments that are commensurate with the functions of

4  unskilled work," "respond appropriately to supervision, co-workers and usual work situations,"

5  and "deal with changes in a routine work setting."  (AR 444.)  Dr. Thompson also found that "the

6  limitations assessed . . . lasted 12 continuous months or can . . . be expected to last 12 continuous

7  months at the assessed severity," and that "the earliest date from which the limitations assessed . . .

8  have existed at the assessed severity" was July 31, 2009.  (AR 444.)  Dr. Thompson further opined

9  that

> [Plaintiff] has been in treatment for seven months with the undersigned.  The trauma she suffered at her place of employment has caused clinically significant emotional and cognitive deficits.  She is unable to work, often does not leave her home, has trouble with decision-making, problem solving, speed of processing information, memory, and concentration.  She can become paralyzed with fear and remain in her bedroom at times.  Her mood is unstable.  She isolates herself from others, has pressured speech, anger, feelings of hopelessness, depressed mood, high anxiety, poor self-esteem, insomnia, poor self-confidence, decreased appetite, and frequent crying spells.
>
> Her progress in therapy is painstakingly slow.  She is not able to integrate well in society and certainly cannot work.  Her prognosis is guarded.

18  (AR 445.)

19  In a February 2011 report, Dr. Thompson noted that "[Plaintiff] cannot handle

20  confrontation or high level stress job.  She has improved considerably and with the right training

21  and encouragement can work again."  (AR 605.)  Dr. Thompson also concluded that Plaintiff's

22  "Vocational Prognosis" was "good."  (AR 605.)  In a June 2011 report, Dr. Thompson noted that

23  Plaintiff "feels life is not enjoyable and wants to work.  She is coming out of social withdrawal."

24  (AR 592.)  Dr. Thompson further noted that Plaintiff "reported researching career options and is in

25  the beginning stages of considering possibilities."  (AR 592.)  In a May 2012 report, however, Dr.

26  Thompson opined that Plaintiff "is unable to work secondary to depression, anxiety, cognitive

27  deficits, and emotional instability.  She will remain off work indefinitely."  (AR 589.)

28

United States District Court
Northern District of California

### 4.  Dr. Maria Barnhart

Dr. Maria Barnhart, a psychologist, started seeing Plaintiff in September 2008 and, at the time of her October 2010 report, was seeing Plaintiff monthly.  (AR 422.)  In the October 2010 report, Dr. Barnhart diagnosed Plaintiff with "Major Depressive Disorder, single episode, severe" and "Panic Disorder without Agoraphobia."  (AR 422.)  Dr. Barnhart's prognosis states that Plaintiff "has some setbacks, usually related to issues around her job but overall she has made progress.  The prognosis is good since her depression and anxiety are situational."  (AR 424.)

### 5.  Dr. Benedict Marciano

Dr. Benedict Marciano conducted industrial evaluations of Plaintiff in connection with her workers' compensation claim in August, September, and October 2009.  In the August report, Dr. Marciano described Plaintiff as having been "put down at the work place and over the last year or so particularly stressed and harassed," including an incident in which Plaintiff "found a bag of sex toys put in her desk drawer at the workplace only to find that other female workers knew about it and apparently had been told about it by coworkers."  (AR 336-37.)  In the report, Plaintiff related that "in exchange for her loyalty, aspiration and desire to become a general manager herself that she was made to feel anxious and afraid of losing her job, with episodes of disregard, disrespect, harassment, and discrimination as previously described, all mounting and causing greater anxiety and depression as she continued to work in an adverse, even hostile environment."  (AR 338.)  Dr. Marciano diagnosed Plaintiff with "[w]ork-related stress of a long-term accumulative nature" and "[s]econdary anxiety and depression" "of industrial causation."  (AR 340.)  The report concluded that "[p]atient is temporary [sic] totally disabled on industrial basis and cannot return to workplace unless determined otherwise on a psychiatric basis."  (AR 341.)  The October report stated that "[p]laintiff relates that . . . she had met an employee from Sam's Club with whom she worked, who has asked her to come back to the work place because they 'need her leadership.'"  (AR 319.)  The report affirmed Plaintiff's prior diagnosis of "[w]ork-related stress" and "[s]econdary anxiety and depression with panic history," and recommended that she "remain off work today through to November 17, 2009."  (AR 319.)

1

### 6.  Drs. Paul Klein, E. Rodgers, & A. Franco

2        Drs. Paul Klein, E. Rodgers, and A. Franco, all non-examining physicians appointed to

3   Plaintiff's social security case, did not find Plaintiff to be disabled as of November 2010.  Dr.

4   Klein assessed Plaintiff's functional capacity pursuant to Form SSA-2506-BK sections 12.02 to

5   12.10 in November 2010.  (AR 425-38.)  Dr. Klein's assessment found that Plaintiff's impairment

6   was not severe enough to keep her from working, finding that Plaintiff had adequate "memory and

7   understanding," "sustained concentration, persistence, and pace," "adaption to change in most

8   work-like settings," and that Plaintiff was "[a]ble to accept instructions from supervisors and

9   interact appropriately with supervisors, limited coworker and public contact."  (AR 438.)

10        Dr. Rodgers performed an evaluation of Plaintiff spanning from September 2008 to

11  October 2010, and found that she was only "[p]artially credible" because her symptoms were "not

12  consistent [with the] severity of allegations."  (AR 440.)

13        Dr. Franco did a follow-up evaluation of Plaintiff spanning from August 2009 to

14  December 2010 and affirmed Dr. Rodgers' original determination that Plaintiff is "capable at

15  least" of simple repetitive tasks "with limited coworker and public contact."  (AR 507.)  Dr.

16  Franco also found that Plaintiff's condition "was not as restricted or adverse as presented by Dr.

17  Thompson."  (AR 507.)

18        ### 7.  Dr. Linda Webster

19        Dr. Linda Webster, a psychologist, performed an evaluation of Plaintiff in April 2012.

20  (AR 598.)  Plaintiff was referred to Dr. Webster to determine whether Plaintiff has a learning

21  disability.  (AR 598.)  Dr. Webster noted that Plaintiff "would like to study to become a teacher or

22  a social worker."  Dr. Webster concluded the assessment as follows:

23              The results of this assessment are consistent with a learning
            disability in long-term retrieval, reading, and written expression.
24          [Plaintiff's] overall general intellectual ability is estimated to be in
            the average range, consistent with her performance on a fluid
25          reasoning task, and her math skills.  Since these areas are strengths
            for her, she would do best in vocations that utilize these skills.  Her
26          verbal ability and reading and written language are normative
            weaknesses, and qualify her for accommodations in academic and
27          vocational settings; including, but not limited to: additional time on
            tests and an alternative testing environment, and copies of instructor
28          notes, and a note-taker.  She would likely find coursework in

10

teaching and social work challenging and frustrating, if not impossible."

(AR 603).

###### D.    The ALJ's Decision

Following a hearing before Administrative Law Judge Caroline H. Beers ("the ALJ"), the ALJ engaged in a five-step inquiry to evaluate Plaintiff's allegations of disability.   The ALJ found Plaintiff to have been disabled, but from only July 31, 2009 to April 25, 2011—a so-called "closed period" of disability.  (AR 31.)  At step one, the ALJ concluded that Plaintiff "has not engaged in substantial gainful activity since July 31, 2009, the date the claimant became disabled."  (AR 28.) At step two, the ALJ found Plaintiff's depression to be a "severe impairment" because "[d]uring the closed period of disability, [Plaintiff's depression] caused more than minimal functional limitations in [Plaintiff's] ability to perform basic work activities."  (AR 29.)  The ALJ also found that Plaintiff's depression continued to be a severe impairment at the time of the hearing.  (AR 31.)  The ALJ did not find Plaintiff to have a severe physical impairment.[1]  (AR 29.)

At step three, the ALJ found Plaintiff's mental impairment was sufficiently severe to meet the requirements of 20 C.F.R. sections 404.1520(d) and 404.1525 during the closed disability period.  (AR 29-30.)  The ALJ followed a two-step process by which it must be determined 1) whether Plaintiff possesses an "underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and 2) whether "the intensity, persistence, and limiting effects of the claimant's symptoms . . . limit the claimant's ability to do basic work activities."  (AR 29-30.)  The ALJ concluded that "from July 31, 2009 through April 25, 2011, the severity of the claimant's impairment met the criteria of section 12.04A & B."  (AR 30.)  This decision was "substantiated by the consistent medical evidence of record as a whole," including a "comprehensive psychological re-evaluation" of Dr. Polner in which Dr. Polner "confirmed [Plaintiff's] mental severe impairment and associated symptoms."  (AR 30.)  The ALJ also relied on a December 2010 "medical source statement of the claimant's treating psychologist Rebecca Thompson."  (AR 30.)

---

[1] Plaintiff does not contest on appeal that she has a disability due to any physical impairment.

United States District Court
Northern District of California

The ALJ concluded that the "assessments of the State agency consultant and medical examiners, to the extent they are inconsistent with th[e] decision, are given less weight because other medical opinions are more consistent with the record as a whole and evidence received at the hearing level shows that the claimant is more limited than determined by them."  (AR 30.)

The ALJ, however, concluded that, beginning April 26, 2011, the severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04."  (AR 31.)  The ALJ considered paragraphs B and C of listing 12.04, and found that Plaintiff met neither criterion as of April 26, 2011 because Plaintiff has no restriction in activities of daily living and only moderate difficulties in social functioning and concentration, persistence, and pace.  (AR 31.)

At step four of the analysis, the ALJ made the following RFC findings:

> [B]eginning April 26, 2011, [Plaintiff] has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple tasks consistent with SVP2 entry level work, as defined in Dictionary of Occupational Titles; she can maintain superficial contact with co-workers and occasional interaction with the public; and she can make simple work-related decisions with occasional workplace changes.

(AR 32.)  The ALJ assigned "little weight" to Dr. Thompson's and Dr. Leon's early 2012 opinions that Plaintiff is totally unable to work because they are "inconsistent with the findings of Dr. Polner and the claimant's admitted extensive activities of daily living."  (AR 33.)  The ALJ explained that the RFC was actually on the low-end of Plaintiff's ability, given Plaintiff's enrollment in college:

> [e]xcept for her allegations of an inability to concentrate and not wanting to be around people, both of which the undersigned has credited in the RFC assessment adopted above, there is no reason to believe her mental symptoms are as markedly limiting as suggested by Dr. Thompson and Dr. Leon since April 26, 2011.  On the contrary, the mere fact the claimant is taking college courses, albeit with some accommodations (and goes to classes with other students); suggests she is at least capable of reliable and sustained unskilled work consistent with the undersigned's RFC assessment.

(AR 33.)

The ALJ relied on the testimony of the VE at step five, finding that, considering Plaintiff's

United States District Court
Northern District of California

"age, education, work experience, and residual functioning capacity," Plaintiff was capable of performing certain work existing "in significant numbers in the national economy." (AR 34.) These jobs included "[s]orter," "[m]achine operator," and "[p]ackager." (AR 34.)

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the Court has authority to review the Commissioner's decision to deny benefits. A district court may overturn a decision to deny benefits only if it is not supported by substantial evidence or if the decision is based on legal error. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53 F.3d at 1039. Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are to be resolved by the ALJ. *See id.*; *Magallenes*, 881 F.2d at 750. "The ALJ is entitled to draw inferences logically flowing from the evidence." *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984) (internal citations omitted); *see Batson v. Commissioner*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion."). "The court may not engage in second-guessing." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). "It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the Commissioner's determination as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, not the Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue,* 2009 WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).

## DISCUSSION

Plaintiff raises four arguments in support of her motion of summary judgment: 1) the ALJ improperly rejected the opinions of Plaintiff's physicians, 2) the ALJ improperly discredited Plaintiff's testimony, 3) the hypotheticals posed to the VE did not include all of Plaintiff's limitations, and 4) the ALJ did not comply with the medical improvement regulations. The Court addresses each argument in turn.

United States District Court
Northern District of California

United States District Court
Northern District of California

**A.  The ALJ's Weighing of the Medical Evidence was Proper**

Plaintiff argues that the ALJ erred in giving reduced weight to the opinions of Plaintiff's treating physicians—Drs. Thompson and Leon—as well as one of Plaintiff's examining physicians, Dr. Webster.  Social Security regulations provide that treating sources be given controlling weight when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  To reject an uncontradicted opinion of a treating physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

"Even if a treating physician's opinion is contradicted, the ALJ may not simply disregard it."  *Ghanim v. Colvin*, --- F.3d ----, 2014 WL 4056530, at *5 (9th Cir. Aug. 18, 2014).  The ALJ is required to consider specified factors in determining the weight it will be given.  *See* 20 C.F.R. § 404.1527(c); *see also Orn v. Astrue*, 495 F.3d 625, 632–33 (9th Cir. 2007).  Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician.  20 C.F.R. § 404.1527(c)(2)(i)–(ii).  Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record.  *Id.* § 404.1527(c)(3)–(6).  "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record."  *Orn*, 495 F.3d at 633 (internal quotations marks omitted).  The same standard is applied to the opinion of examining physicians.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

As an initial matter, Plaintiff is incorrect that a "clear and convincing" standard applies here, as that standard applies only if the ALJ rejects the *uncontroverted* opinion of a treating or

14

examining physician.  *See Lester*, 81 F.3d at 830; *see also Ghamim*, 2014 WL 4056530 at *5 ("to

reject an uncontradicted opinion of a treating physician the ALJ must provide clear and convincing

reasons that are supported by substantial evidence").  Here, some of the opinions of Drs.

Thompson and Leon are in direct conflict with those of Dr. Polner as of April 25, 2011, which the

ALJ relied on in granting Plaintiff a closed period of disability.  Specifically, Dr. Polner's

comprehensive evaluation on April 25, 2011 found Plaintiff to be more optimistic and exploring

career options, and concluded that, while Plaintiff continues to experience emotional trauma,

"none of the testing suggests that [Plaintiff's] clinical symptoms are grossly incapacitating."  (AR

555.)  Dr. Polner further opined that Plaintiff's "Temporary and Total Disability" ended as of

April 25, 2011.  (AR 556.)  Given this conflict in the medical evidence, the Court must consider

whether the ALJ provided "specific and legitimate reasons" for deviating from the opinions of

Drs. Thompson, Leon, and Webster, and whether those reasons are "supported by substantial

evidence in the record."  *Lester*, 81 F.3d at 830.

Plaintiff insists  that "Dr. Thompson's opinions and Dr. Leon's opinions are the only post-

April, 2011 opinions from examining or treating mental health physicians that address [Plaintiff's]

mental functioning using Social Security criteria."  (Dkt. No. 13 at 3.)  She argues that Dr.

Polner's assessment of Plaintiff is insufficient because

> Dr. Polner never addressed whether [Plaintiff's] impairments meet
> or equal Listing 12.04.   Dr. Polner  never  addressed whether
> [Plaintiff] is capable of performing substantial gainful activity at
> step five of the sequential evaluation process.  Nor did Dr. Polner
> address [Plaintiff's] mental functional capacity limitations.  Except
> for offering a vocational opinion that [Plaintiff] could not perform
> her past work, Dr. Polner never addressed anything relevant to
> [Plaintiff's] being disabled under the criteria of the Social Security
> Act after April 25, 2011.

(*Id*.)  The Court is unpersuaded.  Plaintiff does not  cite any authority supporting her contention

that an ALJ cannot rely on a physician's medical opinion if that opinion fails to include an

analysis of the Social Security criteria.  While "the amount of understanding of [the] disability

programs and their evidentiary requirements that an acceptable medical source has" is a factor

(among several) in considering what level of weight to assign a medical opinion, 20 C.F.R. §

404.1527(c)(6), there is no per se requirement that the medical source apply the Social Security

United States District Court
Northern District of California

1    disability criteria.

2         Further, Plaintiff's assertion that Dr. Polner's opinion cannot contradict other medical

3    opinions because it was made in response to Plaintiff's workers' compensation claim is

4    undermined by Plaintiff's admission that "*she* is relying on Dr. Polner's opinion that she cannot do

5    her past work and that she was totally disabled during the period from June, 2009 through April

6    25, 2011." (Dkt. No. 13 at 4 (emphasis added).)  Although Dr. Polner's opinions were made in the

7    context of Plaintiff's workers' compensation claim, Plaintiff provides no rationale for accepting

8    the pre-April 25, 2011 opinions (the ones favorable to Plaintiff) and rejecting the April 25, 2011

9    opinion.  Moreover, "[t]he purpose for which medical reports are obtained does not provide a

10   legitimate basis for rejecting them."  *Lester v*, 81 F.3d at 832 .  The upshot of Dr. Polner's April

11   25, 2011 report is that, even though Plaintiff is in need of further mental health treatment, she has

12   improved and is ready to return to work (though not to her previous job).  That this opinion was

13   made for purposes of a workers' compensation claim does not render it useless..

14        The ALJ provided a specific and legitimate reason for giving reduced weight to the

15   opinions of Drs. Thompson and Leon; namely, Plaintiff's "extensive activities of daily living."

16   (AR 33); *see Ghanim*,---F.3d---, 2014 WL 4056530, at *6 (holding that a conflict between a

17   medical opinion and a claimant's daily activities a "may justify rejecting a treating provider's

18   opinion").  As the ALJ explained, Drs. Leon's and Thompson's conclusion that Plaintiff is totally

19   unable to work is at odds with Plaintiff  taking and doing relatively well in college courses (albeit

20   with some accommodations), attending church, living with roommates, and taking care of herself

21   without the assistance of others.  Although Plaintiff was also engaging in these activities for part

22   of the closed period of disability, the ALJ was not precluded from relying on Plaintiff's daily

23   activities in weighing the evolving medical opinions.  The decision to reject Drs. Leon's and

24   Thompson's opinions in light of their inconsistency with Plaintiff's activities and with Dr.

25   Polner's April 25, 2011 opinion tas more consistent with her activities is specific and legitimate

26   and supported by substantial evidence.  Further, even if the clear and convincing standard applies,

27   Plaintiff's completion of on-campus college courses—even with accommodations—provides a

28   clear and convincing reason supported by substantial evidence to reject the medical opinions of

United States District Court
Northern District of California

16

total disability after April 25, 2011.

Plaintiff also contends that the ALJ erred by failing to discuss Dr. Webster's April 2012 opinion. Plaintiff asserts that Dr. Webster recommended that Plaintiff receive "accommodations in academic and vocational settings . . . including, but not limited to: additional time on tests and an alternative testing environment, and copies of instructor notes, and a note-taker." (AR 603.) It is not apparent that Dr. Webster's opinion that Plaintiff has some limitations is in conflict with the ALJ's ultimate determination, which recognized that Plaintiff could work only with certain limitations. In fact, Dr. Webster opined that Plaintiff's "overall general intellectual ability is estimated to be in the average range, consistent with her performance on a fluid reasoning task, and her math skills. Since these areas are strengths for her, she would do best in vocations that utilize these skills." (AR 603.) In other words, Dr. Webster emphasized Plaintiff's ability to work and suggested that Plaintiff seek out work that would use her pre-existing vocational skills. Further, while Dr. Webster states that Plaintiff needs accommodations in the vocational setting, none of her suggested accommodations relate to working; rather, Dr. Webster's accommodations relate to Plaintiff's abilities in an academic setting. Thus, even if the ALJ's failure to discuss Dr. Webster's opinion was error, any error was harmless. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless."); *see also Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991) (finding harmless error where erroneous findings were inconsequential to the disability determination).

**B. The ALJ's Credibility Determination was Proper**

The ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible beginning April 26, 2011, to the extent they are inconsistent with the residual functional capacity assessment ." (AR 32.) Plaintiff argues that the ALJ improperly rejected Plaintiff's credibility by "unfairly characteriz[ing]" and "minimiz[ing]" Plaintiff's testimony. (Dkt. No. 11 at 24.)

If the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of

United States District Court
Northern District of California

17

the symptoms if she gives "specific, clear and convincing reasons" for the rejection.  *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  An ALJ's findings concerning credibility must be "grounded in evidence" and articulated with "sufficient[ ] specific[ity] [so as] to make clear to the individual and to any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96–7p, 1996 WL 374186 (July 2, 1996).  In making such a determination, the ALJ may consider at least the following: claimant's reputation for truthfulness, inconsistencies in claimant's testimony, claimant's daily activities, work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *See Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002).  The ALJ is not "required to believe every allegation of disabling[symptoms], or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Further, when evaluating credibility, an ALJ may consider "the claimant's daily activities," 20 C.F.R. §§ 404.1529(c)(3)(i),416.929(c)(3)(i); *see also Fair*, 885 F.2d at 603 (stating that the claimant's daily activities may be evidence upon which an "ALJ can rely to find a pain allegation incredible"), and work history, *see Thomas*, 278 F.3d at 959.

The ALJ relied on Plaintiff's extensive daily activities to conclude that Plaintiff's claims of total disability were not credible.  As noted above, Plaintiff leaves the house almost daily, attending her college classes and tutoring sessions four days a week for several hours.  Plaintiff is pursuing an advanced degree so that she may obtain a job working with children.  Plaintiff also attends church, drives to doctors' appointments, and goes on walks.  These activities provide a clear and convincing reason to discredit Plaintiff's testimony that she cannot work at all, even after April 25, 2011 when Dr. Polner opined that her condition had improved.  *See Valentine v. Commissioner Social Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (recognizing that although claimant's daily activities did not suggest that he could return to prior work, they did suggest that the alleged severity of limitations were exaggerated).  In addition, the ALJ cites inconsistencies between Plaintiff's testimony and the medical reports of Dr. Polner who opined that as of April 25, 2011, Plaintiff's condition was not totally disabling.  This inconsistency provides an additional

18

clear and convincing reason supporting the ALJ's determination that Plaintiff was not fully credible.  *See Thomas*, 278 F.3d at 958-59.

Plaintiff's arguments to the contrary fail to reconcile her college attendance with her claims of inability to work.  Plaintiff asserts that her courses are basic and that she needs accommodations to manage her workload.  Plaintiff also contends that attending college classes does not mean she has the ability to "work in coordination" with co-workers.  (Dkt. No. 11 at 22.)  Even so, Plaintiff ignores that the ALJ agreed that she indeed had some serious workplace limitations despite her daily activities; namely, that she is limited to "simple tasks," "superficial contact" with co-workers, "occasional interaction" with the public, and "simple work-related decisions with occasional workplace changes."  (AR 32.)  Plaintiff fails to articulate why she would be unable to perform a job with such limitations in light of her responsibilities at school.  Further, even if it is reasonable to view Plaintiff's college workload as consistent with her alleged inability to work, such an alternative reasonable examination of the evidence does not warrant overturning the ALJ's decision.  *See Batson v. Commissioner*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion.").

### C.  The ALJ's Hypotheticals to the VE were Proper

Plaintiff argues that the ALJ failed to include all of Plaintiff's limitations in the hypotheticals presented to the VE, and that the VE's testimony should thus be precluded as evidence.  Defendant argues that the ALJ did, in fact, include all limitations referenced in her RFC finding, and was not obligated to include limitations proposed by the physicians upon whose opinions the ALJ did not rely.

The ALJ's RFC finding placed the following limitations on Plaintiff's ability to work:

> [B]eginning April 26, 2011, the claimant has had the residual functioning capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple tasks consistent with SVP2 entry level work, as defined in Dictionary of Occupational Titles; she can maintain superficial contact with co-workers and occasional interaction with the public; and she can make simple work-related decisions with occasional workplace changes.
>
> (AR 32.)

At the hearing, the ALJ posed the following hypotheticals to the VE:

> [L]et's assume we have an individual who is of the Claimant's age, education and work history and this individual does not have exertional limitations but this individual can perform simple tasks that are consistent with SVP: 2 entry level work, can make simple work-related decisions with occasional work place changes and can maintain superficial contact with coworkers and can occasionally interact with the public . . . .
>
> Let's say we have everything in the first hypothetical and then we add that this individual can work 45 minutes out of each hour on a sustained basis . . . .

(AR 57-59.)

"[T]he ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (internal quotation marks omitted). "The limitation of evidence in a hypothetical question is objectionable only if the assumed facts could not be supported by the record." *Magallanes v. Bowen*, 881 F.2d 747, 757 (9th Cir. 1989). The ALJ's hypotheticals properly incorporated the medical record and included all of the limitations upon which the ALJ relied in making the residual functioning capacity assessment. These limitations are adequately supported by the record, and the ALJ was not obligated to incorporate the limitations proposed by the physicians whose opinions the ALJ ultimately rejected.

As to the VE's opinion on cross-examination by Plaintiff's counsel that heightening the limitation on Plaintiff's ability to interact with coworkers "would preclude unskilled work," (AR 59), "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel." *Magallanes*, 881 F.2d at 756. Further, Plaintiff's reliance on *Russell v. Sullivan*, 930 F.2d 1443, 1455 (9th Cir. 1991) is inapposite. In *Russell*, the ALJ excluded uncontroverted medical evidence in formulating the hypothetical to the VE. 930 F.2d at 1445. As discussed above, the ALJ here properly gave reduced weight to controverted medical opinions.

**D.  The ALJ Complied with the Medical Improvement Regulations**

Finally, Plaintiff argues that the ALJ failed to demonstrate "changes in the signs, symptoms, or laboratory findings" to make a finding of medical improvement pursuant to 20

C.F.R. § 404.1594(b)(1).  (Dkt. No. 11 at 27.)  In cases involving the termination of disability

benefits, the Commissioner must determine "if there has been any medical improvement in [a

claimant's] impairment(s) and, if so, whether this medical improvement is related to [the

claimant's] ability to work."  20 C.F.R. § 404.1594(a).  The Commissioner bears the burden of

establishing that a claimant has experienced medical improvement that would allow him to engage

in substantial gainful activity.  *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983).  "Although

the Ninth Circuit has not yet addressed whether this standard also applies to cases involving closed

periods of disability, the Circuits that have are largely in agreement that it does."  *Bruna v. Astrue*,

2013 WL 1402362, at *16 (N.D. Cal. Apr. 5, 2013) (collecting cases); *see also Waters v.*

*Barnhart*, 276 F.3d 716, 718–719 (5th Cir. 2002) (holding that "in closed period cases, the ALJ

engages in the same decision-making process as in termination case" and therefore, that the

medical improvement standard applies to the cessation date in closed period cases).  Given that

Defendant does explicitly address Plaintiff's argument that the medical improvement standard

applies to this closed period case, and in light of the ALJ's application of the standard in her

decision (*see* AR 31-32 ¶¶ 8-9), this Court follows *Bruna* and finds that the medical improvement

standard is applicable.

Plaintiff's argument regarding medical improvement is restricted to the ALJ's alleged

failure to determine that "there has been a decrease in the medical severity of [a claimant's]

impairment(s) which was present at the time of the most recent favorable medical decision that

[the claimant] w[as] disabled or continued to be disabled.  A determination that there has been a

decrease in medical severity must be based on changes (improvement) in the symptoms, signs

and/or laboratory findings associated with [a claimant's] impairment(s)."  20 C.F.R. §

404.1594(b)(1).  Plaintiff contends that the ALJ did not make such a determination; rather, "[s]he

simply interpreted Dr. Polner's third evaluation report as showing medical improvement."  (Dkt.

No. 11 at 24.)  The Court fails to see the error in relying on Dr. Polner's April 25, 2011 report as

evidence of a decrease in medical severity.  After all, Dr. Polner's report emphasizes the

improvement in Plaintiff's condition that, as of April 25, 2011, ended her "Temporary and Total

Disability."  (AR 556, 549.)  Plaintiff's contention that the ALJ did not compare Dr. Polner's

April 25, 2011 evaluation with her earlier evaluations is incorrect.  The ALJ specifically relied on Dr. Polner's earlier opinions in finding Plaintiff disabled during the closed period; once those opinions changed, so did the ALJ's disability determination.  There is no error.

## CONCLUSION

For the reasons explained above, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

This Order disposes of Docket Nos. 11 & 12.

**IT IS SO ORDERED.**

Dated: August 26, 2014

_Jacqueline S. Corley_

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California